1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10
11

SHELLY B. MEDINA,                                  Case No.  1:13-cv-00664-SKO

12

         Plaintiff,

13

      v.                                                    **ORDER REGARDING PLAINTIFF'S**
                                                       **COMPLAINT**

14

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

15
16

        Defendant.

17

_____/

18

## INTRODUCTION

19

      Plaintiff Shelly B. Medina ("Plaintiff") seeks judicial review of a final decision of the

20

Commissioner of Social Security (the "Commissioner" or "Defendant") denying her claim for

21

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to

22

Titles II and XVI of the Social Security Act (the "Act").  42 U.S.C. §§ 405(g), 1383(c)(3).  The

23

matter is currently before the Court on the parties' briefs, which were submitted, without oral

24

argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

25
26
27
28

_____

[1] The parties consented to the jurisdiction of the United States Magistrate Judge for all purposes.  (Docs. 7, 9.)

**FACTUAL BACKGROUND**

Plaintiff was born in 1972, graduated high school, received some specialized job training, and worked as an office clerk.  (Administrative Record ("AR") 52, 53, 135, 145-45.)  On April 2, 2010, Plaintiff filed applications for DIB and SSI, alleging disability beginning on June 1, 2004, due to anxiety disorder and panic disorder.  (AR 108-21, 134.)   At the hearing before the administrative law judge ("ALJ") Laura Havens, Plaintiff stated that her alleged disability onset date was October 1, 2004, which is the date the ALJ considered in her decision.  (AR 25-32, 44.)

**A.     Relevant Medical Evidence**[2]

In January 2006, Plaintiff was admitted to Doctors Medical Center, where she delivered a baby through caesarean section.  (AR 242-68.)  The records note that she had gestational diabetes. (AR 242.)

In June 2006, Plaintiff was treated for left knee pain.  (AR 305.)  A knee x-ray showed no significant bony, soft tissue, or articular abnormality.   (AR 316.)   An August 25, 2006, examination note indicates Plaintiff's knee pain had "improved."  (AR 304.)

On November 13, 2008, Plaintiff was seen by Ernesto Sameno, M.D., at Stanislaus Health Services Agency ("Stanislaus").  (AR 300.)  Plaintiff was diagnosed with anxiety but was noted to be less "tearful" than she had appeared at examination on November 6, 2008.  (AR 300.)  Her dosage of Celexa was increased.  Plaintiff had been clean of methamphetamine for two months. (AR 300.)

Plaintiff was seen by David Sandoval, LCSW, at Stanislaus on November 25, 2008. (AR 299.)  Plaintiff reported that she had been clean of methamphetamine for three months and that "things seem to be going better than in the past."  (AR 299.)  She stated that she has "good support," was attending "welfare to work classes," and that she "would eventually like to get a job. This will help [her] feel better."  (AR 299.)  Plaintiff indicated that her medication was "helping." (AR 299.)

---

[2] Although the Court has reviewed the entire administrative record, only evidence relevant to the disputed issues will be summarized.

1    On December 10, 2008, Plaintiff was seen at Stanislaus. (AR 298.) Plaintiff was deemed

2    "improving overall," and her depression was noted to be "improving." (AR 298.) Plaintiff's

3    medication was refilled. (AR 298.)

4    On December 16, 2008, Plaintiff was seen by Mr. Sandoval for a consultation. (AR 297.)

5    Plaintiff stated that she "has lots of anxiety" and "worried about many things." (AR 297.) Mr.

6    Sandoval noted Plaintiff would qualify for educational groups. (AR 297.)

7    Plaintiff was seen by Marc Nielsen, D.O., on December 22, 2008, for panic attacks. (AR

8    296.) Plaintiff indicated that she was requesting disability and general assistance for depression

9    and anxiety. (AR 296.) Dr. Nielsen noted that Plaintiff had recently started Celexa and that he

10   would fill out the "general assistance waiver." (AR 296.) Dr. Nielsen opined that Plaintiff would

11   benefit from vocational education and job placement. (AR 296.)

12   On December 29, 2008, Plaintiff was seen briefly by Mr. Sandoval, who noted that

13   Plaintiff was "very anxious about her condition as well as the forms that [the doctor] was helping

14   her complete." (AR 295.) While discussing her panic attack, Plaintiff became "tearful and

15   appeared anxious again." (AR 295.) Plaintiff stated that "she does want to work eventually but

16   a[t] present wants to figure out what is wrong with her." (AR 295.)

17   On December 30, 2008, Plaintiff met with Dr. Nielsen for an evaluation of anxiety and

18   past history of methamphetamine use. (AR 294.) Plaintiff reported that "she has had difficulty

19   [with] anxiety and maintaining relationships," and "she also had difficulty keeping a job because

20   of her anxiety." (AR 294.) Plaintiff quit using methamphetamines four months prior, and became

21   "tearful when talking about her drug use affecting her children." (AR 294.) Dr. Nielsen

22   diagnosed Plaintiff with general anxiety disorder and methamphetamine dependence, brief, in full

23   remission. (AR 294.) Plaintiff was started on Wellbutrin, and her medication usage was to be

24   reassessed in six weeks. (AR 294.) Dr. Nielsen opined that Plaintiff should be "[o]ffer[ed] short

25   (2-3 month) disability until stable on medication." (AR 294.)

26   On January 5, 2009, Dr. Nielsen reported Plaintiff had an acute, medically verifiable

27   condition that would limit her from performing certain tasks and that she should be off work for

28   three months, until March 30, 2009, to allow her to seek treatment. (AR 408-11.) Dr. Nielsen

opined that Plaintiff "need[ed] to have psychotropic medications properly titivated prior to being fit to work or take vocational classes," and recommended work restrictions for three months.  (AR 410.)

On January 6, 2009, Dr. Nielsen treated Plaintiff for a twisted left knee.  (AR 293.)    On September 14, 2009, Plaintiff was seen by Mr. Sandoval.  (AR 285.)  Plaintiff reported she was "very stressed" due to her family situation and she had suffered a "few relapses."  (AR 285.) Plaintiff stated she could not function outside of the home.  (AR 285.)  Plaintiff was worried about her financial situation and reported that she was "cut off of TANF because [her] boyfriend is on SSI."  (AR 285.)  Plaintiff reported she was not working, and she was "not sure if she could with the level of anxiety she is experiencing, but she would like to explore this possibility."  (AR 285.) Plaintiff stated that "she stopped the medications because she did not feel they were helping her." (AR 285.)

On March 22, 2010, Plaintiff reported to Mr. Sandoval that she was not taking her medications but she "feels like the Wellbutrin . . . [had] helped her."  (AR 282.)  Plaintiff stated "she has been having more anxiety attacks and her mood is all over the place."  (AR 282.) Plaintiff noted she "has been using some coping skills but feels bad because she fell off the wagon two times in the past."  (AR 282.)  She had difficulty sleeping.  (AR 282.)

On March 29, 2010, Plaintiff was seen by Mr. Sandoval and reported she was "always worried that something bad is going to happen" and there was "a lot of trauma in the past." (AR 281.)  Plaintiff "stated that she had a job in the past and that she just stopped going because it was too hard."  (AR 281.)  She indicated "medication has helped a little in the past."  (AR 281.)

On April 2, 2010, Plaintiff was seen at Stanislaus for chronic anxiety and depression, and reported she had not used methamphetamines for one month.  (AR 280.)  Plaintiff was given samples of Abilify.  (AR 280.)

On April 9, 2010, Plaintiff reported to Mr. Sandoval that her treating physician had "called in the medications" and she was "doing much better with things at home."  (AR 278.)  Plaintiff stated that the medications gave her "a little hope," and it was noted Plaintiff was "happy that things are well."  (AR 278.)  On April 19, 2010, Plaintiff informed Mr. Sandoval that she was

"almost 'high' like with the medications," but "they still seem to be helping." (AR 274.) She was "still doing okay" but "feeling anxious." (AR 274.) She was doing more around the house. (AR 274.) On April 26, 2010, Plaintiff reported she was "doing a little better." (AR 272.) On May 3, 2010, Plaintiff stated she was "doing much better," and believed that Zoloft was helping her. (AR 271.)

On June 17, 2010, Christina Ceballos, P.A., completed a form regarding Plaintiff's capabilities. (AR 412-15.) Ms. Ceballos indicated Plaintiff had a medically verifiable condition that would prevent her from performing certain tasks and she was unable to work. (AR 412.) Ms. Ceballos stated Plaintiff "suffers from anxiety [and] depression on a daily basis. This affects her ability to interact with others [and] to be around other people and large crowds." (AR 415.) Ms. Ceballos noted that Plaintiff was "improving [with] current medication [and] counseling." (AR 415.)

On July 28, 2010, Anna M. Franco, Psy.D., completed a psychiatric review. (AR 339-56.) Plaintiff suffered from general anxiety disorder, panic disorder, avoidant/dependent disorder, and substance abuse disorder. (AR 339-45.) Dr. Franco opined that Plaintiff would have mild restrictions in activities of daily living and maintaining social functioning and moderate difficulties in maintaining concentration, persistence, and pace. (AR 347.) Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions, and in her ability to work in coordination with or in proximity to others without distraction. (AR 351.)

On September 24, 2010, Plaintiff was treated by Alisha Pratt, D.O., at Stanislaus. (AR 378.) Dr. Pratt noted Plaintiff had quit methamphetamine use two weeks before the examination and had been out of her psychiatric medication for two months. (AR 378.) She admitted to "self-medicating." (AR 378.) Plaintiff was "scared to work, to be out in the world," and was "teary-eyed." (AR 378.) Dr. Pratt noted Plaintiff's history of "methamphetamine-induced psychosis," and encouraged Plaintiff to quit using methamphetamines. (AR 378.) Plaintiff's medications were re-started and dosage levels increased. (AR 378.) Plaintiff was noted to be obese. (AR 378.) On October 5, 2010, Dr. Pratt noted that Plaintiff had "improved control" on medication. (AR 375.)

In September and October 2010, Plaintiff was seen by Darlene Thompson, LCSW, at Stanislaus.  (AR 372, 374, 376, 377.)  Plaintiff stated that the anti-depressant medication helped to stabilize her depression, but she continued to have anxiety.  (AR 372.)  Ms. Thompson recommended behavioral change plans and gave Plaintiff a schedule for AA/NA meetings and "Celebrate Recovery" programs in the area.  (AR 372.)

On November 15, 2010, Dr. Pratt noted Plaintiff demonstrated an "improved mood," with medication.  (AR 371.)  Plaintiff also had a "knee strain" and exercise was recommended. (AR 371.)  An x-ray of Plaintiff's left knee was unremarkable.  (AR 366.)

On December 3, 2010, a state agency reviewing physician, A. Garcia, M.D., performed a cases analysis and affirmed Dr. Franco's assessments.  (AR 382-83.)

From January 2011, Plaintiff was seen by Ms. Thompson; Plaintiff reported that she initially felt better after medication changes but believed her symptoms were getting worse. (AR 407.)  On February 15, 2011, Plaintiff reported to Ms. Thompson that she avoids social situations or endures them with intense anxiety.  (AR 404.)  In March 2011, Ms. Thompson noted that Plaintiff's physician increased her Zoloft, but Plaintiff was not taking the increased dosage because she was concerned she would "run out."  (AR 401.)

On March 22, 2011, Fatoumata Lelanta, M.D., at Stanislaus, treated Plaintiff for knee pain. (AR 400.)  Plaintiff was advised to apply ice and given a prescription for ibuprofen.  (AR 400.)  A magnetic resonance imaging ("MRI") scan of Plaintiff's right knee was performed in April 2011 and showed no meniscal or ligament tear, two small foci of Grade II to III chondromalaci patella, small joint effusion, and Baker cyst with cyst rupture.  (AR 392.)

On April 1, 2011, Ms. Thompson noted that Plaintiff had "improvement in mood and affect with the increase in Zoloft."  (AR 398.)  On April 15, 2011, Plaintiff "appeared better than in previous sessions" and reported "some improvement in her depression and energy level with the increase in medication."  (AR 397.)  Plaintiff was still upset due to stressors in her life.  (AR 397.) On April 21, 2011, Plaintiff "was tearful as she talked about symptoms of worry and intense anxiety," but "stated that the depression/anxiety [was] 'less intense' with the increase in Zoloft." (AR 397.)  On May 4, 2011, Ms. Thompson noted that Plaintiff "continues to struggle with her

depression and energy level as she is trying to manage being a single mother, pay the bills, and be unsure about the status of [her] relationship" with her boyfriend.  (AR 394.)

On September 3, 2011, Plaintiff was seen by Patricia Spivey, Psy.D., for a psychological disability evaluation.  (AR 416-21.)  Dr. Spivey performed a mental status exam and determined that Plaintiff's "[t]thought process and content were normal.  No evidence of poor reality testing or responding to internal stimuli.  She demonstrated normal full affect.  Judgment was good.  Mood was low."  (AR 417.)  Dr. Spivey found that "[o]verall [Plaintiff's] cognitive function is within normal limits."  (AR 417.)  Dr. Spivey opined Plaintiff had mild impairments in her ability to maintain pace or persistence to complete one- or two-step simple and complex tasks; moderate limitation in her ability to withstand the stress of a routine work day; and moderate/marked limitation in her ability to maintain emotional stability/predictability and interact appropriately with co-workers, supervisors, and the public on a daily basis.  (AR 418.)

**B.      The ALJ's Decision**

On October 17, 2011, the ALJ issued a decision finding Plaintiff not disabled from October 1, 2004, through the date of the decision.  (AR 20-32.)  The ALJ found that (1) Plaintiff had met the insured status requirements of the Act through December 31, 2009; (2) Plaintiff had not engaged in substantial gainful activity since October 1, 2004, the alleged disability onset date; (3) Plaintiff had the following severe impairments: depression, anxiety, and posttraumatic stress disorder based on the requirements in the Code of Federal Regulations, but obesity was not a severe impairment; (4) Plaintiff did not have an impairment or combination of impairments that met or equaled one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (5) Plaintiff had the residual functional capacity ("RFC")[3] perform a full range of work at all exertional levels that involved only simple repetitive tasks and limited public contact; (6) Plaintiff could not perform her past relevant work; (7) Plaintiff was 32 years old and therefore considered a

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  Id.  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

1   "younger individual" on the alleged disability onset date; (8) Plaintiff has at least a high school

2   education and can communicate in English; (9) the transferability of job skills was not material to

3   the disability determination because Plaintiff was "not disabled" under the Medical-Vocational

4   Rules whether or not Plaintiff had transferrable job skills, (10) there were jobs that exist in

5   significant numbers in the national economy that Plaintiff could perform; and (11) Plaintiff had

6   not been under a disability, as defined in the Act, at any time from October 1, 2004, the alleged

7   onset date, through the date of the decision.  (AR 25-32.)

8   **C.     The Appeals Council Decision**

9       Plaintiff sought review of the ALJ's decision with the Appeals Council, and submitted

10  additional evidence which the Appeals Council incorporated into the administrative record.

11  (AR 6.)

12         **1.      Evidence Submitted to the Appeals Council**

13      On March 22, 2011, Plaintiff was seen by Dr. Lelanta for a medication refill and right knee

14  pain.  (AR 438.)  An x-ray of the knee was ordered.  (AR 438.)  Plaintiff was given a prescription

15  for ibuprofen and told to apply ice to the knee.  (AR 438.)  An MRI of the right knee was

16  performed in April 2011 and showed no meniscal or ligament tear, two small foci of Grade II to

17  III chondromalaci patella, small joint effusion, and Baker cyst with cyst rupture.  (AR 439.)[4]

18      On April 4, 2011, Dr. Pratt noted that Plaintiff was stable and less depressed on

19  medication, but was still having issues with people being around her.  (AR 437.)  Plaintiff's

20  medication was refilled.  (AR 437.)  Plaintiff reported right knee pain.  (AR 437.)

21      On June 7, 2011, Mr. Thompson noted that Plaintiff appeared depressed and tearful due to

22  "multiple stressors building up."  (AR 447.)  On June 29, 2011, Dr. Pratt stated that Plaintiff was

23  "overall stable.  Improved mood but complicated home situation."  (AR 433.)  Plaintiff's right knee

24  pain was "stable" and she was being referred to an orthopedist.  (AR 433.)

25      Plaintiff was seen by John Casey, M.D., on August 12, 2011, for an orthopedic

26  consultation.  (AR 441-42.)  Dr. Casey noted that Plaintiff was morbidly obese and has "crepitus

27

28  [4] Both the March 2011 visit to Dr. Lelanta and the April 2011 MRI were among the evidence considered by the ALJ.  (*See* AR 392, 400.)

1  with both active and passive flexion-extension of her left knee."  (AR 441.)  Dr. Casey reported

2  that Plaintiff

> has a range of motion from 0-110 with pain on further flexion.  Her medial
> collateral ligament and lateral collateral ligament are noted to be intact.  She has
> negative anterior drawer, negative Lachman and negative pivot shift.  Her Q angle
> is normal.  McMurray's test is negative.  Neurovascular status distally is otherwise
> intact.

6  (AR 441.)  Dr. Casey opined that Plaintiff's "primary problem is patallefemoral chondromalacia."

7  (AR 441.)  Plaintiff's ligamentous examination was otherwise negative and an MRI scan was

8  unremarkable.  Plaintiff was informed that "weight reduction is extremely important," and was

9  prescribed ibuprofen and physical therapy.  (AR 441.)

10  On October 16, 2011, Dr. Pratt noted that Plaintiff had "severe chronic depression - overall

11  stable but could be better."  (AR 436.)  Dr. Pratt concurred with the orthopedist's recommendation

12  that Plaintiff lose weight.  (AR 436.)

13  Mr. Thompson noted on November 11, 2011, that Plaintiff was "feeling more anxious,

14  fearful, and anger within the past few months."  (AR 445.)  Plaintiff was "fairly consistent with her

15  medications and occasionally will miss a dose."  (AR 445.)

16  On December 15, 2011, Ms. Thompson wrote a letter on behalf of Plaintiff's claim for

17  disability.  (AR 454.)  Ms. Thompson indicated that she had been seeing Plaintiff since October

18  2010 for behavioral counseling.  Ms. Thompson opined that, "[d]espite the therapeutic and

19  medication interventions, [Plaintiff's] symptoms and level of function continue to be impaired."

20  (AR 454.)  Plaintiff "has several impairments in her ability to handle stress, interact with others,

21  maintain social relationships, manage her depression and anxiety, and go into the community."

22  (AR 454.)  Plaintiff became "anxious and agoraphobic" when required to complete small tasks,

23  such as waiting for the bus, and would "either avoid the fearful situations or endure them with

24  intense and overwhelming anxiety."  (AR 454.)

25  **2.  Appeals Council Decision**

26  Although the Appeals Council made the additional evidence part of the administrative

27  record, it determined review of the ALJ's decision was unwarranted and denied Plaintiff's request

28

1   for review on December 14, 2012.  (AR 1-6.)  Therefore, the ALJ's decision became the final

2   decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

3   **D.      Plaintiff's Current Appeal**

4          On May 7, 2013, Plaintiff filed the current complaint before this Court seeking review of

5   the ALJ's decision.  (Doc. 1.)  Plaintiff contends that (1) new evidence incorporated into the record

6   and considered by the Appeals Council establishes additional severe impairments that affect the

7   RFC, and (2) the ALJ gave insufficient reasons to reject the opinions of Ms. Ceballos, Dr. Spivey,

8   and Dr. Nielsen.  (Doc. 13.)

9                                         **SCOPE OF REVIEW**

10         The ALJ's decision denying benefits "will be disturbed only if that decision is not

11  supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599,

12  601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its

13  judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).

14  Instead, the Court must determine whether the Commissioner applied the proper legal standards

15  and whether substantial evidence exists in the record to support the Commissioner's findings.  *See*

16  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

17         "Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v.*

18  *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

19  relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

20  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*,

21  305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

22  the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

23  may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v.*

24  *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

25                                         **APPLICABLE LAW**

26         An individual is considered disabled for purposes of disability benefits if he is unable to

27  engage in any substantial, gainful activity by reason of any medically determinable physical or

28  mental impairment that can be expected to result in death or that has lasted, or can be expected to

1  last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),

2  1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or

3  impairments must result from anatomical, physiological, or psychological abnormalities that are

4  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

5  such severity that the claimant is not only unable to do his previous work, but cannot, considering

6  his age, education, and work experience, engage in any other kind of substantial, gainful work that

7  exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

8      The regulations provide that the ALJ must undertake a specific five-step sequential

9  analysis in the process of evaluating a disability.  In the First Step, the ALJ must determine

10  whether the claimant is currently engaged in substantial gainful activity.     20 C.F.R. §§

11  404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the claimant

12  has a severe impairment or a combination of impairments significantly limiting her from

13  performing basic work activities.   20 C.F.R. §§ 404.1520(c), 416.920(c).  If so, in the Third Step,

14  the ALJ must determine whether the claimant has a severe impairment or combination of

15  impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20

16  C.F.R. 404, Subpart P, App. 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If not, in the Fourth Step,

17  the ALJ must determine whether the claimant has sufficient residual functional capacity despite

18  the impairment or various limitations to perform her past work.   20 C.F.R. §§ 404.1520(f),

19  416.920(f).  If not, in Fifth Step, the burden shifts to the Commissioner to show that the claimant

20  can perform other work that exists in significant numbers in the national economy.  20 C.F.R. §§

21  404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the

22  sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99

23  (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

24                    **DISCUSSION**

25      Plaintiff contends that new evidence incorporated into the record and considered by the

26  Appeals Council establishes Plaintiff has additional severe impairments that affect the RFC and

27  make application of the Medical-Vocational Guidelines (the "Grids") as a framework improper

28

without testimony from a vocational expert ("VE").  Plaintiff further asserts that the ALJ gave insufficient reasons to reject the opinions of Ms. Ceballos, Dr. Spivey, and Dr. Nielsen.  (Doc. 13.)

Defendant contends the evidence submitted to the Appeals Council does not impact the RFC and remand for consideration of the new evidence is not warranted.  Additionally, the ALJ permissibly analyzed the disputed opinions.  (Doc. 14.)

## A.   New Evidence Submitted to the Appeals Council Does Not Render the ALJ's Decision Unsupported by Substantial Evidence

Plaintiff submitted to the Appeals Council medical records from Paradise Medical Office and Stanislaus, and a letter from Ms. Thompson.  (AR 429-54.)  The Appeals Council incorporated the evidence into the record, considered it in conjunction with the record as a whole, but declined to review the ALJ's decision.  (AR 1-6.)  Plaintiff contends the new evidence establishes the severe impairments of obesity and chondromalacia,[5] which impacts the RFC and requires remand for the ALJ's consideration.  (Doc. 13, 7:21-9:7.)

Where a claimant submits "new and material evidence" to the Appeals Council relating "to the period on or before the date of the [ALJ's] decision," the Appeals Council must consider the additional evidence in determining whether to grant review.   20 C.F.R.  §§ 404.970(b), 416.1470(b).   When the evidence postdates the ALJ's decision, the Appeals Council must still consider it if it is "related to" the period before the ALJ's decision.  *Taylor v. Comm'r Soc. Sec. Admin.*, 659 F.3d 1228, 1233 (9th Cir. 2011).  The Appeals Council will grant review if it finds "that the [ALJ's] action, finding, or conclusion is contrary to the weight of the evidence currently of record."  20 C.F.R. §§ 404.970(b); 416.1470(b).  Otherwise, the Appeals Council will consider the additional evidence but deny review.  Pursuant to *Taylor*, when the Appeals Council considers a post-hearing treating physician's opinion, it need not provide a "detailed rationale" or make any particular evidentiary findings as to why it rejected the post-hearing opinion.  659 F.3d at 1232. Here, the Appeals Council considered the additional evidence submitted by Plaintiff, but denied review, rendering the ALJ's decision final.   Therefore, the additional evidence is part of the

---

[5] Chondromalacia is defined as "softening of the articular cartilage, most frequently in the patella."  *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") 358 (31st ed. 2007).

administrative record for purposes of "determin[ing] whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence."  *Brewes v. Comm'r Soc. Sec. Admin.*, 682 F.3d 1157, 1163 (9th Cir. 2012).

### 1.    Dr. Casey's Examination Report and Findings

On August 12, 2011, Dr. Casey performed an orthopedic consultation and noted Plaintiff's left knee pain and obesity.  (AR 441.)  Plaintiff was found to have crepitus[6] with both active and passive flexion-extension of her left knee, but all other findings were normal and an MRI scan indicated that the meniscus was intact.  (AR 441.)  Dr. Casey recommended Plaintiff lose weight, use ibuprofen, and participate in physical therapy.  (AR 441.)

Plaintiff contends that both obesity and chondromalacia should be assessed as severe impairments, alone and in combination.  Plaintiff asserts that, while the ALJ found that Plaintiff's obesity was not severe, the new evidence establishes morbid obesity, which impacted the chondromalacia.  As such, further development and analysis of these impairments is required, and the RFC is no longer supported by substantial evidence.  (Doc. 13, 8:18-24.)

Defendant asserts Dr. Casey's examination findings noted only Plaintiff's subjective pain report but recorded essentially normal objective clinical findings, other than a notation of crepitus. There was no clinical assessment of any physical limitations associated with Plaintiff's reported pain.  Further, Plaintiff's knee pain and obesity were mentioned throughout the record, and there is no basis to conclude Dr. Casey's treating notes would have necessitated a different analysis or mandated a different outcome by the ALJ.  (Doc. 14, 15:3-26.)

The ALJ considered Plaintiff's obesity and determined that it was not severe:

> The National Institute of Health (NIH) has identified medical criteria for the diagnosis of obesity (SSR 02-1p.)  The NIH uses the Body Mass Index (BMI), a number that shows body weight adjusted for height.  As BMI increases, chances of an individual developing obesity related diseases and complications increase. According to the BMI calculator at the website for the National Health, Lung and Blood Institute, . . . the claimant has a BMI of 39.3.  Since obesity is defined by a BMI of 30 or greater, the claimant's BMI is consistent with obesity.  The evidence does not suggest that the claimant is in any way limited because of her condition. In addition, no physician has ever placed any functional limitations on her as a result of her obesity.

---

[6] Joint crepitus is defined as "the grating sensation caused by the rubbing together of the dry synovial surfaces of joints, also called articular."  *Dorland's* 417.

1  (AR 25-26.)

2        While Plaintiff's BMI may have increased since the ALJ's consideration of Plaintiff's

3  obesity, Plaintiff does not submit evidence establishing the BMI increase impacted Plaintiff's

4  functional capacity.  Plaintiff had a history of knee pain, but this was considered by the ALJ and

5  determined to be not disabling.  (*See* AR 293, 305, 371, 400.)  X-rays and MRIs of Plaintiff's

6  knees were unremarkable and essentially normal, including an x-ray reviewed by Dr. Casey.  (*See*

7  AR 316, 366, 392, 441.)  Dr. Casey's evaluation does not contain a clinical assessment of any

8  limitations associated with Plaintiff's condition.  (AR 441.)  While Plaintiff contends "Dr. Casey

9  diagnosed morbid obesity and found it affecting chondromalacia, knee pain, and ambulation," Dr.

10  Casey noted that problems with ambulation and pain were subjective reports of Plaintiff.  Dr.

11  Casey offered only that Plaintiff had crepitus and that "weight reduction was extremely

12  important."  (AR 441.)

13        Moreover, Dr. Casey's treatment plan for Plaintiff was limited to the use of ibuprofen and

14  physical therapy for "quad strengthening."  (AR 441.)  Dr. Lelanta's March 22, 2011, clinical

15  findings pertaining to Plaintiff's knee also noted crepitus and pain with extension and flexion and,

16  similar to Dr. Casey, Dr. Lelanta prescribed ibuprofen and instructed Plaintiff to apply ice.  (AR

17  400.)  Thus, Dr. Casey's report was essentially identical to the clinical findings in the record before

18  the ALJ, and Plaintiff has not shown that there were any additional functional limitations caused

19  by either her increased obesity or chondromalacia that were indicated in Dr. Casey's evaluation.

20  As such, the ALJ's analysis is not undermined by Dr. Casey's report and remains supported by

21  substantial evidence in the record.  Accordingly, remand for consideration of Dr. Casey's findings

22  is unsupported.

23        **2.**      **Additional Evidence from Ms. Thompson**

24        Plaintiff also contends remand is required to allow the ALJ to consider the opinions of the

25  treating social worker, Ms. Thompson, who wrote a letter on December 15, 2011, and opined that

26  Plaintiff had "several impairments in her ability to handle stress, interact with others, maintain

27  social relationships, manage her depression and anxiety, and go into the community."  (AR 454.)

28

Ms. Thompson is a social worker and, as such, is not an "acceptable medical source" but is considered an "other source."  20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1) (other sources include "nurse-practitioners, physicians' assistants, natropaths, chiropractors, audiologists, and therapists").  Social Security Ruling ("SSR")[7] 06-03p explains that "only 'acceptable medical sources' can give us medical opinions" pursuant to 20 C.F.R. §§ 404.1513(a) and 416.913(a).  Further, "only 'acceptable medical sources' can be considered treating sources, as defined in 20 [C.F.R. §] 404.1502 and [§] 416.902, whose opinions may be entitled to controlling weight."  *Id*.  Because "other sources" are treated like lay witnesses, the ALJ may disregard their opinions by providing a "germane reason."  *Turner v. Comm'r*, 613 F.3d 1217, 1224 (9th Cir. 2010); *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

Here, the ALJ considered the medical records from Stanislaus Health Service, which included the treatment records from Ms. Thompson.  (AR 28.)  As such, the clinical notes underlying Ms. Thompson's December 2011 letter were before the ALJ.  Plaintiff does not argue that the ALJ improperly considered the Stanislaus records, including Ms. Thompson's treatment records, nor does Plaintiff show how Ms. Thompson's December 2011 letter expands on treatment records that were already considered by the ALJ.  Ms. Thompson's letter does not present new clinical findings that would render the ALJ's assessment improper.  (*See* AR 454.)

As such, when viewing the record as a whole, the new evidence submitted to the Appeals Council does not render the ALJ's decision unsupported by substantial evidence.

**B.      The ALJ Provided Sufficient Reasons to Reject Medical Opinions**

Plaintiff contends the ALJ gave insufficient reasons to reject the opinions of Ms. Ceballos, Dr. Spivey, and Dr. Nielsen.  (Doc. 13, 9:15-11:14.)  Defendant contends that the ALJ permissibly analyzed these opinions.  (Doc. 14, 13:1-19:14.)

**1.      The ALJ's Consideration of Ms. Ceballos' Opinion**

Ms. Ceballos is a physician's assistant, and like Ms. Thompson, is not an "acceptable

---

[7] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted.  20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding precedent upon ALJs.  *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692 n.2 (9th Cir. 1999).

1  medical source."  SSR 06-03p.  Accordingly, the ALJ may disregard her opinions by providing a

2  "germane reason."  *Turner*, 613 F.3d at 1224; *Dodrill*, 12 F.3d at 919.

3        In considering Ms. Ceballos opinions, the ALJ found

> Ms. Ceballos, P.A.[,] of Paradise Medical Office, stated that the claimant had a
> condition that would limit or prevent her from performing certain tasks.  She also
> noted that the claimant is unable to work and has limitations that would interfere
> with education or training.  Ms. Ceballos also noted that the claimant's anxiety and
> depression affect[] her ability to work with others.  She also noted that the
> claimant's condition is improving (Exhibit 14F) . . . . Physicians' assistants are not
> identified as acceptable medical sources and therefore the undersigned gives this
> opinion little weight.

9  (AR 29-30.)

10        The ALJ's reason for rejecting Ms. Ceballos' opinion is because she is not an acceptable

11 medical source.  The ALJ is required to give a germane reason for rejecting the opinion of

12 someone who is not an acceptable medical source.  *Turner*, 613 F.3d at 1224.  The ALJ's mere

13 identification of Ms. Ceballos as a non-acceptable medical source is not a germane reason to reject

14 her opinion.

15        The ALJ, however, provided a germane reason to reject Ms. Ceballos' opinion by noting

16 that Ms. Ceballos found that Plaintiff was "improving."  (AR 30; *see also* AR 415 (Ms. Ceballos

17 finding that Plaintiff was "improving [with] current medication [and] counseling.")  The ALJ is

18 not required to recite the "magic words" of "I reject [this] opinion . . . because . . ."  *Magallanes v.*

19 *Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).  "As a reviewing court, we are not deprived of our

20 faculties for drawing specific and legitimate inferences from the ALJ's opinion." *Id.*  Here, the

21 ALJ noted that Ms. Ceballos found Plaintiff was "improving" with medication and counseling.

22 (AR 30, AR 415.)  "Impairments that can be controlled effectively with medication are not

23 disabling for the purpose of determining eligibility for SSI benefits."  *Warre v. Comm'r of Soc.*

24 *Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006).  As such, it was reasonable for the ALJ to

25 determine Ms. Ceballos' finding that Plaintiff was improving and the severity of her condition had

26 decreased undercut her opinion that Plaintiff was unable to work and her limitations interfered

27 with education and training.  *See id*.  The ALJ's reason for discounting Ms. Ceballos' opinion in

28 this regard was specific and germane.

16

**2.      The ALJ's Consideration of Dr. Spivey's Opinion**

Plaintiff contends the ALJ gave insufficient reasons to reject Dr. Spivey's opinion.  The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id*.  Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions. *Id*.  If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id*. at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 692 (9th Cir. 2009).  The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

In pertinent part, the ALJ discussed Dr. Spivey's findings as follows:

> Dr. Spivey noted . . . the claimant has moderate to marked limitations in maintaining emotional stability/predictability and interacting appropriately with supervisors and the public on a daily basis . . . .  The claimant has marked limitations in interacting with coworkers . . . . Little weight is given to the doctor's opinion on interacting with supervisors and coworkers because the record indicates that the claimant is able to adequately interact with individuals.  For example, the claimant cares for her children and interacts with her doctors and some friends.

(AR 29.)

Plaintiff contends the ALJ's rejection of Dr. Spivey's opinion that Plaintiff had marked limitations in interacting with supervisors and coworkers was not specific and legitimate.  Specifically, the ALJ rejected this portion of Dr. Spivey's opinion because the record demonstrated Plaintiff was able to interact appropriately with family, friends, and doctors.  (Doc. 13, 10:16-25.)

Plaintiff asserts her interaction with family, friends, and doctors were not as "formal" as those in a work setting and therefore less demanding. (Doc. 13, 10:19-22.) As such, Dr. Spivey's opinion in this regard should have been credited and included in Plaintiff's RFC. (Doc. 13, 10:23-25.)

Defendant contends Plaintiff's interactions with her doctors, particularly Dr. Spivey, were "formal" interactions, and Plaintiff was "cooperative and pleasant" during her visit to Dr. Spivey. (Doc. 14, 18:1-6; *see also* AR 417.) Plaintiff thus demonstrated an ability to interact with others during her doctors' visits, and the ALJ provided sufficient reasons to reject the portion of Dr. Spivey's opinion regarding Plaintiff's limitations concerning interacting with supervisors and coworkers. (Doc. 14, 18:6-11.)

Here, the ALJ reviewed the record and found Plaintiff was not markedly limited in her interaction with others, including interactions with her doctors. (AR 29.) The ALJ explained that Plaintiff's demonstrated abilities to interact with others, such as doctors, friends, and family, would allow her to interact with coworkers and supervisors, and Dr. Spivey's finding that Plaintiff's ability in this area was markedly limited was not supported by the evidence in the record. Because the ALJ reasonably interpreted the record based on Plaintiff's numerous public interactions, the Court must affirm the ALJ's finding regarding Dr. Spivey's opinion. *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citation omitted) ("the ALJ's interpretation . . . may not be the only reasonable one," so long as it is "still a reasonable interpretation and is supported by substantial evidence" it is not the Court's "role to second-guess it").

**3.     The ALJ's Consideration of Dr. Nielsen's Opinion**

Dr. Nielsen treated Plaintiff in association with her mental conditions. He indicated on January 5, 2009, that Plaintiff had an acute, medically verifiable condition that would limit her from performing certain tasks and that she should be off of work for three months to allow her to seek treatment. He opined that she needed to have psychotropic medications properly "titivated" prior to being fit to work or take vocational classes, and recommended work restrictions for three months. (AR 410.)

The ALJ considered Dr. Nielsen's opinion and determined as follows:

1
2
3
4
5
6
7

> Marc Nielsen, D.O., the claimant's treating doctor, stated that the claimant is not able to work and has limitations that affect her ability to work or participate in education or training.  The doctor recommended that the claimant be restricted from work for three months and get the psychiatric medications she needs.  Dr. Nielsen also noted that the claimant has no present day activity restrictions, but her severe anxiety does result in limited social functioning.  He also pointed out that the claimant would have impaired memory and cognition until treatment is complete.  (Exhibit 13F).  The undersigned accords little weight to this opinion because Dr. Nielsen only restricts the claimant for a three-month period in September 2009 and implied that his opinion could change whether or not the claimant undertakes proper treatment.  There were no other opinions in the record from Dr. Nielsen.

8  (AR 29.)

9      Plaintiff contends Dr. Nielsen's opinion was ambiguous, and the ALJ should have re-
10 contacted the doctor rather than reject the opinion.  Specifically, Plaintiff notes Dr. Nielsen's
11 opinion was "not firm on the duration, only speculative if Plaintiff successfully titrated
12 psychotropic medication."  (Doc. 13, 11:10-11.)  Defendant contends that the ALJ properly
13 rejected Dr. Nielsen's opinion because he found Plaintiff's condition was only expected to last for
14 three months.  (Doc. 14, 18:17-28.)

15      Unless an impairment is expected to result in death, it must have lasted or be expected to
16 last a continuous period of at least twelve months in order to be considered a disabling
17 impairment.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1509, 416.909.  Here,
18 Dr. Nielsen's opinion to restrict Plaintiff from work for only three months was reasonably
19 interpreted by the ALJ as indicating Dr. Nielsen believed Plaintiff's mental limitations would not
20 preclude her from work for a longer duration than 3 months.  Moreover, Dr. Nielsen characterized
21 Plaintiff's condition as "acute" and expressly stated that it was only expected to last until March
22 30, 2009.  (AR 408.)  Thus, even crediting Dr. Nielsen's statement that Plaintiff's condition
23 precluded her from work, the opinion did not indicate Plaintiff's preclusion from work met the
24 durational requirement.  This was a rational interpretation of Dr. Nielsen's opinion and constitutes
25 a rational basis to conclude any finding of disability by Dr. Nielsen was limited to a 3-month
26 period, which does not meet the requirements of the Act.

27      Additionally, the ALJ noted Dr. Nielsen implied his opinion would change if Plaintiff
28 received proper treatment and medication, and that such improvement would not support a

disability finding.   (AR 29; *see also* AR 410.)   The record provides substantial evidence that Plaintiff's condition improved with medication.   (*See* AR 271, 274, 298, 299, 371, 375, 398, 415, 437.)   These reasons were a legally sufficient basis for the ALJ to determine Dr. Nielsen's conclusion that Plaintiff was unable to work was not entitled to deference.

Plaintiff contends Dr. Nielsen's findings were ambiguous and the ALJ should have re-contacted the doctor to further develop the record.   "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry."   *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).   The duty to develop the record can be satisfied by (1) making a reasonable attempt to obtain medical evidence from the claimant's treating sources; (2) ordering a consultative examination when the medical evidence is incomplete or unclear and undermines the ability to resolve the disability issue; (3) subpoenaing or submitting questions to the claimant's physicians; (4) continuing the hearing; or (5) keeping the record open for more supplementation.   *Id.* at 1150.   Even if Dr. Nielson's opinion was ambiguous with regard to how Plaintiff would fare on medication, the ALJ satisfied any further duty to develop the record by ordering a subsequent consultative evaluation with Dr. Spivey.   *Id.*

### CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.   Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.   The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **May 13, 2014**                              **/s/ Sheila K. Oberto**
                                                    UNITED STATES MAGISTRATE JUDGE